UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| JARRON DRAPER, | : |
| Plaintiff, | : |
| | :  CIVIL ACTION NO. |
| v. | : |
| | :  1:06-CV-487-MHS |
| ATLANTA INDEPENDENT SCHOOL SYSTEM, | : |
| | : |
| Defendant. | : |
| | : |

### ORDER

This matter is before the Court on defendant's motion to stay enforcement of due process hearing decision. For the reasons set forth below, the Court denies defendant's motion.

Background

This case arises under the Individuals With Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq. Plaintiff Jarron Draper ("J.D.") is a nineteen year old rising twelfth grade student at Benjamin E. Mays High School within the Atlanta Independent School System ("APS"). On November 24, 2004, J.D. filed

his due process hearing request before the Georgia Office of State Administrative Hearings, alleging that APS had denied him a free appropriate public education ("FAPE") under the IDEA. The matter was heard on three separate days in November of 2005 before Administrative Law Judge ("ALJ") Steven D. Caley of the Office of State Administrative Hearings for the State of Georgia.

On January 6, 2006, the ALJ found that APS had failed to provide a FAPE to J.D. for the 2002-03, 2003-04, and 2004-05 school years.[1] The ALJ further that since 1998 when J.D. was in the third grade, APS had failed to provide J.D. with the key to his education by properly teaching him to read. The ALJ stated that APS had misdiagnosed J.D. by labeling him with the stigma of mental retardation as early as the third grade and then APS made no effort whatsoever to further evaluate J.D. for five years contrary to clearly established law. Although J.D. exhibited classic signs of dyslexia at a very early age, the ALJ found that APS was still incapable of making a proper diagnosis and it was only due to the continued insistence of J.D.'s family for more testing after March of 2003 that led to a proper diagnosis of a learning disability in July of 2003.

---

[1] The ALJ found that the two year statute of limitations applicable to an IDEA claim barred any claim in the case prior to the 2002 school year.

The ALJ further determined that J.D.'s family had no choice but to enroll him in an outside reading program at the Sylvan Learning Center at their own expense for a total cost of $11,000. After five months at the Sylvan Learning Center, J.D.'s reading level increased from grade three to grade five. J.D.'s family could not continue to pay for this expense, and APS refused to pay for it. Instead, APS insisted on using a Lexia reading program, which the family agreed to but reserved their rights to proceed with a due process hearing request. Additional testing in 2004 after J.D. was placed in the Lexia reading program showed that he had regressed from a fifth grade reading level to a third grade reading level and was having difficulty in many of his core subjects in high school.

The ALJ also found that J.D. had continually claimed a right to additional services from APS at every individualized education program ("I.E.P.") meeting that had been held since at least early 2003. J.D. was pursuing that claim actively at the time of May 2005 I.E.P. meeting. Therefore, the ALJ concluded that J.D. had not agreed to an I.E.P. on May 12, 2005, but instead the family continued to insist on additional private remediation services in reading.

The ALJ concluded that APS had not provided J.D. a basic floor of opportunity as required by law, and that APS' insistence upon a reading program that had not resulted in even a minimal educational benefit to J.D. in almost a three year period with respect to his reading ability, did not satisfy the requirements of IDEA. The ALJ found that J.D. was entitled to compensatory services and that an entity other than APS should provide those services if J.D. elected. The ALJ concluded that APS had forfeited its right to continue to "educate" J.D. by misdiagnosing J.D., refusing to re-evaluate J.D. for five years, insisting on continuing with a course of instruction for almost three years despite no benefit to J.D., etc. The ALJ found that the appropriate remedy was for J.D. to choose from two options: Option 1 included remaining in the APS with the addition of various support services and Option 2 included placing J.D. outside the APS at a private school.[2] In addition, the ALJ held that J.D. was entitled to

---

[2] The options set out by the ALJ are as follows:

> Option 1: He may choose to remain in the [APS] and, if this choice is made, he will be entitled to 60 minutes per day, five days per week, of intensive multi-sensory reading services provided by either the Sylvan Learning Center program or the Lindamood-Bell Center program at J.D.'s sole election or at any other program agreed upon mutually by the parties. APS shall pay all costs of transportation to and from any such program. If J.D. desires such reading services to be provided elsewhere, his I.E.P. team must approve his request. Teachers

(continued...)

4

[2](...continued)

      in all of J.D.'s classes shall be trained in dyslexia including instructional strategies for a dyslexic student. A certified special education teacher shall be provided to J.D. for each of his classes and shall provide one-on-one instruction in conjunction with the regular teacher during the class to the extent J.D. requests it. At J.D.'s election, at least one hour per day of tutorial services for J.D.'s classes shall be provided. At J.D.'s election, the tutorial services shall be provided during his study skills class, after school, or on Saturdays. No more than two hours of tutorial service are required to be made on Saturdays. J.D. shall also be entitled to extended services during the summer months which shall include the same services described above for the regular school year. During the first year, APS through J.D.'s I.E.P. team shall evaluate J.D.'s progress at least monthly and shall insure that appropriate testing to measure his progress is done at six month intervals by an independent evaluator selected by J.D. After the first year, APS through J.D.'s I.E.P. team shall meet at reasonable intervals and shall insure that appropriate testing to measure his progress is done at least annually by an independent evaluator selected by J.D. All services shall be provided at APS expense and shall continue until J.D. has graduated from high school with a regular high school diploma or until June 2009 whichever is earlier; or

      Option 2: If, in order to complete his high school education, J.D. desires a placement outside the [APS], J.D. shall provide to APS a list of three proposed private schools inside the State of Georgia to provide regular education and special education services for his dyslexia. APS shall choose one of the three schools 30 days from the date it receives the list. APS shall pay the costs of transportation to and from the school. APS shall pay for all reasonable costs to attend the chosen school which shall not exceed $15,000 per year unless APS agrees to pay a higher sum. J.D. shall be entitled to extended services during the summer months which shall include the same services provided during the regular school year. J.D. shall be entitled to these services until he receives a regular high school diploma or until June 2009 whichever is earlier. During the

(continued...)

reimbursement of $11,000 for the costs incurred at the Sylvan Learning Center in 2003 and to all litigation costs including expert witness fees and attorney fees incurred in bringing the action.

Both J.D. and APS have challenged the ALJ's decision by filing separate complaints in federal court. The Court consolidated the matters into one action, Case No. 1:06-CV-497-MHS. Presently before the Court is APS' motion to stay enforcement of the ALJ's decision.

Discussion

The IDEA requires school districts to provide a FAPE to students with disabilities who, because of their impairments, need special education and related services. The IDEA requires that the FAPE be provided in the least restrictive

---

[2](...continued)
first year, APS shall pay for an independent evaluation at 6-month intervals to measure J.D.'s educational progress. J.D. shall have the right to select the evaluator. After the first year, APS shall pay for an independent evaluation at least annually to measure J.D.'s educational progress. J.D. shall have the right to choose the independent evaluator. APS shall pay the costs of all such evaluations.

ALJ Final Order at pp. 36-37.

6

environment, and children with disabilities must be educated with children who are not disabled to the maximum extent appropriate. 20 U.S.C. § 1412(a)(5)(A); 34 C.F.R. § 300.550. To provide a FAPE, a school formulates an I.E.P. during a meeting between the student's parents and school officials, and the plan must be amended if its objectives are not met, although perfection is not required. 20 U.S.C. §§ 1414(d)(1)(A)-(B), (d)(4).

Under the IDEA, a student may file a due process hearing request if he believes that he has been denied procedural or substantive rights to a FAPE. In Georgia, such hearings are conducted by the Office of State Administrative Hearings. O.C.G.A. § 50-13-41(a)(1). Any party aggrieved by the result of the administrative proceedings has the right to bring a civil action in the district court. 20 U.S.C. § 1415(i)(2)(a).

Congress recognized that proceedings under the IDEA could span several years, and therefore Congress provided a "stay-put provision" in the IDEA which dictates a child's educational placement during these proceedings: "[D]uring the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain

in the then-current educational placement of such child." 20 U.S.C. § 1415(j). Congress did not intend that the "stay-put provision" would operate inflexibly and provided for interim placements where the parents and school officials were able to agree on one. Honig v. Doe, 484 U.S. 305, 324-25 (1988). Accordingly, the "stay-put provision" has been interpreted to provide the following: "If the decision of a hearing officer in a due process hearing conducted by the SEA or a State review official in an administrative appeal agrees with the child's parents that a change of placement is appropriate, that placement must be treated as an agreement between the State or local agency and the parents for purposes of [§ 1415(j)]." 34 C.F.R. § 300.514(c). Finally, the injunctive effect of § 1415(j) is automatic and requires no further showing. Wagner v. Bd. of Educ. of Montgomery County, 335 F.3d 297, 301 (4th Cir. 2003).

Turning to APS' motion, the Court must interpret this "stay-put provision" as it applies to J.D. Such interpretation is important because it not only determines where J.D. should be placed physically, but also who should bear the cost. See Sch. Comm. of the Town of Burlington, Mass. v. Dep't of Educ., 471 U.S. 359 (1985).

APS argues that J.D.'s education placement must remain as it was pursuant to the most recent I.E.P. that is currently in place for him and was in place at the time of the hearing. APS contends that J.D.'s current placement is dictated by an I.E.P. that was developed for him on May 12, 2005.[3] APS argues that J.D. and his Aunt, Denice Morgan, participated in the development of the I.E.P. on May 12, 2005, and signed it. APS contends that there is no evidence that there has been a subsequent I.E.P. or any agreement between the parties to change J.D.'s current placement.

APS further avers that the ALJ's decision does not constitute an agreement between APS and J.D.'s parents for purposes of altering J.D.'s placement. APS avers that J.D.'s parents were not part of the hearing, and they never asserted that they were seeking a change of placement for him or private schooling. Instead, APS avers that J.D.'s representatives during the pre-hearing discussions and correspondence made it clear that they were not seeking J.D.'s removal from the APS High School and that they were not seeking placement in a private school.

---

[3] This I.E.P. provides that J.D. receives special education services at Mays High School in the program areas of Specific Learning Disability and Speech/Language Impairment and direct special education instruction in Language Arts and Reading, and that J.D. works toward obtaining a regular education diploma.

APS argues that neither J.D., his parents, nor his Aunt ever agreed that a change of placement was appropriate. APS contends that the ALJ does not make a clear placement decision but gives J.D. the option to choose a change of placement. Therefore, APS argues that the ALJ's decision could not constitute an "agreement" with J.D.'s parents that a particular change in placement was appropriate, and thus APS could not have made an agreement with J.D.'s parents for purposes of altering the stay-put placement.

J.D. argues in response that the May 12, 2005, I.E.P. is not an appropriate stay-put placement for him because neither he, his family, nor his Aunt consented to the May 12, 2005, I.E.P. Regarding the issue of J.D.'s parents' participation in the hearing, J.D. argues that he was over the age of 18 at the time of the hearing and thus the case was filed in his name. J.D. further contends that he was seeking a new I.E.P., or a change in placement, as evidenced by him seeking additional reading services over the past years including services from the Sylvan Learning Center and Lindamood-Bell. J.D. argues that forcing him to remain in the placement described in the May 12, 2005, I.E.P. will result in a further denial of FAPE.

Instead, J.D. argues that the ALJ decision was a change in placement for J.D. and that APS has agreed to this offer. J.D. contends that the law does not require that he "seek" a specific change in placement when pursuing the hearing, but only that the ALJ determine, and the parents agree, that a change of placement is needed. J.D. explains that by virtue of the ALJ decision, APS is deemed to have agreed with J.D. that his current placement is not appropriate and to place him in a private school if that is what J.D. preferred. On March 28, 2006, J.D. states that he elected Option 2, placement in a private school, and presented APS with three schools from which to choose.

J.D. further argues that nothing in the stay-put provision impacts APS' obligation to comply with the compensatory education ordered by the ALJ. J.D. contends that compensatory education to remedy a past denial of FAPE is a separate form of relief from a change of placement to remedy a current inappropriate placement. J.D. argues that nothing in IDEA mandates the automatic stay of the ALJ's decision to award him compensatory education. J.D. avers that if, as APS argues, the ALJ's decision was not a clear placement determination, or change in placement, because the decision only gave J.D. options to choose a change in placement, then the ALJ's decision to award J.D.

11

compensatory education is not covered by IDEA. Thus, APS is not entitled to an automatic stay of the ALJ's decision but must meet the established standards for granting a stay. J.D. argues that APS has not even addressed these standards and cannot meet them.

The Court finds that pursuant to C.F.R. § 300.514(c), the ALJ's decision constitutes an agreement between APS and J.D. See Escambia County Bd. of Educ. v. Benton, 358 F. Supp. 2d 1112, 1122-24 (S.D. Ala. 2005). There is nothing in the language of either § 1415(j) or § 300.514 which states that J.D. must have specifically sought the change in placement that the ALJ eventually decided or that the parents must first signify an agreement by proposing a specific placement. Instead, all that is necessary for APS to have made an agreement is for the ALJ to reach a decision about a change in placement and for J.D.[4] to accept this decision. See Bd. of Educ. of Pine Plains Cent. Sch. Dist. v. Engwiller, 170 F. Supp. 2d 410, 414 (S.D. N.Y. 2001) ("the law treats an administrative decision

---

[4] Although the language of the statute says that "parents" must agree, J.D. had reached the age of majority by the time of the hearing and parental rights transferred to him under the IDEA. Regarding APS' argument that J.D.'s parents were not at the hearing, APS also argues in its brief that J.D. participated in the development of the May 12, 2005, I.E.D. and had reached the age of majority and that parental rights under IDEA had transferred to him. APS cannot have it both ways, and the hearing is not invalidated because J.D.'s parents might not have been present.

favorable to the parents and against the District as creating a *de jure* agreement between the parents and the State"); see also Sch. Comm. Of the Town of Burlington, Mass., 471 U.S. at 372.

Moreover, contrary to APS' arguments, the ALJ's decision made a change in J.D.'s placement by finding in his favor that he was not receiving a FAPE in his current situation. See Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ., 86 F. Supp. 2d 354, 358 (S.D. N.Y. 2000) ("once the parents receive an administrative decision in their favor, the current educational placement changes in accordance with that decision). The ALJ left the specific details of the placement up to J.D. by giving him two options, either of which constitute a change in placement.

The Court's decision is bolstered by the fact that by enacting the IDEA, Congress did not intend to force parents to leave the child in what may turn out to be an inappropriate educational placement. See Sch. Comm. Of the Town of Burlington, Mass., 471 U.S. at 372. Instead, the Act was intended to give children with disabilities an appropriate education and a free one. See id.; see also Clovis Unified Sch. Dist. v. Cal. Office of Admin. Hearings, 903 F.2d 635, 641 (9th Cir. 1990) (a "stay-put provision" will not be read to "force parents to leave a child in

what they feel may be an inappropriate educational placement . . . after a successful administrative ruling").

J.D. has stated in his memorandum to the Court that he chose Option 2 of the ALJ's decision and informed APS of this decision in writing. APS has not contested this. Accordingly, the relevant placement for § 1415(j) purposes is not the most recent I.E.P. predating J.D.'s request for hearing,[5] but is the educational placement which J.D. chose in Option 2. Therefore, the Court denies APS' request to stay enforcement of the ALJ's decision.

Because only the "stay-put provision" is automatic, APS is required to seek a preliminary injunction pursuant to § 1415(i)(2)(B)(iii) to enjoin the portions of the ALJ's decision that do not concern the educational placement of J.D. Wagner, 335 F.3d at 302. APS bears the burden of demonstrating entitlement to such an injunction under the standards used to govern requests for preliminary injunctive relief. Id. To the extent that APS is seeking to enjoin other parts of the ALJ's

---

[5] Because the Court has found that APS and J.D. made an agreement about placement by virtue of the ALJ's decision, the Court need not reach the question of whether the May 12, 2005, I.E.P. was the most recent I.E.P.

decision beyond J.D.'s educational placement during these proceedings, APS has not met its burden, and the ALJ's decision is not enjoined.

Conclusion

For the foregoing reasons, the Court DENIES defendant's motion to stay enforcement of due process hearing decision [#7].

IT IS SO ORDERED, this 19 day of June, 2006.

Marvin H. Shoob, Senior Judge
United States District Court
Northern District of Georgia

15